## Background

A late-night robbery and carjacking brought HPD officers to Morrell Park.  What they knew when they got there and what they did after they arrived is what the parties sharply dispute.

**A.    Sykes tells the story one way.**

In Sykes's telling, he and Deedrick Love were doing nothing more suspicious than sitting in lawn chairs behind their cars at Morrell Park when officers arrived.[1]  He says that patrol lights suddenly flooded the lot, officers announced that they were responding to a robbery, drew their firearms, and ordered both men to put their hands up.[2]  Officer Cody Watts then asked about a "combative altercation" that occurred in the parking lot.[3]  Sykes says that he told Watts what he had seen, gave his first and last name and his date of birth, and pointed out the car that he had traveled in.[4]  In his telling, that should have clarified his role in the encounter.  But he says the tone changed when Officer Brian Shaffer approached and began talking to him "with an attitude like I committed a crime or he had a personal vendetta against me."[5]

From there, Sykes describes the conversation with Shaffer as a steady escalation.  He avers that Shaffer told him that he had illegal tags on his car and that the car would be towed, even though that had nothing to do with the robbery the officers said they were investigating.[6]  Sykes responded that there was nothing illegal about his car, and  Shaffer called him a liar,

---

[1] ECF No. 6 at 4–5.

[2] *Id.* at 4.

[3] *Id.* at 4–5.

[4] *Id.* at 5.

[5] *Id.*

[6] *Id.*

wrongly insisted that Love's car was really his, and called him a liar again when Sykes corrected him.[7]

Sergeant Kevin Abernathy's arrival marks the next turn in Sykes's account.[8]  Sykes says that Abernathy came over and asked for his middle name and that Sykes responded that he had a junior and did not want to be confused with him, so he asked to retrieve documents from the car to clear up who he was.[9]  Instead, Abernathy told Shaffer to "place [Sykes] under arrest for lying to a police officer."[10]  Shaffer then handcuffed him and ignored repeated requests to let him lock the car and retrieve his wallet, cell phone, and keys.[11]  The municipal court later acquitted Sykes of the obstruction charge.[12]

**B.   The officer-defendants tell it another way.**

The officers describe a more urgent and more suspicious scene.[13]  Henderson dispatch received near-simultaneous reports of violence at Morrell Park.  In one, the robbery victim reported in Spanish that he had been carjacked while sitting in his gray Honda Civic.[14]  The dispatch report for that call does not identify the suspects by race.  The other call was logged as a witness report from "Jamie," indicating that a man had been dragged by a vehicle after a fight,

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 5–6, 10.

[12] *Id.* at 11.

[13] The defendants also manually filed bodycam and dashcam footage.  But because their narrative in their briefing does not tie its chronology to specific video timestamps, I rely on the records they actually cite in that background section—dispatch recalls, declarations, reports, arrest paperwork, and court records—when recounting their version of events.

[14] ECF No. 50-2.

that the vehicle remained on scene backed into parking spots in the lot, and that two Black male adults were standing nearby.[15] Defendants Watts, Abernathy, Shaffer, and other officers were dispatched while those reports were still coming in.[16]

In their telling, the scene that greeted them matched the information that dispatch had relayed moments earlier. They found two light-colored cars—a Lexus and a BMW—backed into parking spaces near spilled food and a baseball cap on the pavement, details they believed suggested a recent struggle.[17] Shaffer also states that he saw two men behind those cars, crouching as if to hide from the arriving officers.[18] Given the violent robbery report, the dispatch information, and the scene officers encountered when they arrived, Shaffer and Watts decided to conduct an investigatory stop.[19]

Watts first spoke with Sykes about what he had observed regarding the robbery.[20] But at some point, Watts conducted a records check of "Mark Sykes" that revealed an active local warrant for contempt of municipal court.[21] Watts avers in his declaration that when he tried to confirm whether that warrant belonged to Sykes, Sykes refused to provide his full name or his

---

[15] ECF No. 50-1. But the log also says that the caller was difficult to understand. And the officers' later descriptions do not mirror that language exactly: they say they heard over the radio that a secondary caller or possible witness reported that two silver vehicles backed into parking spaces were involved, but do not clarify if they knew the description of those two men. ECF Nos. 50-3–4. So the record does not establish with precision what Jamie said, what dispatch understood, or exactly how that information was conveyed to the defendant officers.

[16] *See* ECF No. 50-2.

[17] ECF No. 50-3 at 3–4; ECF No. 50-4 at 3; ECF No. 50-5 at 5–8; ECF No. 50-7 at 3.

[18] ECF No. 50-4 at 3, ¶ 14.

[19] ECF No. 50-3 at 4, ¶ 22; ECF No. 50-4 at 3, ¶ 15.

[20] ECF No. 50-3 at 4, ¶ 26.

[21] *Id.* at ¶ 32.

middle name.[22]  Abernathy, too, asked for Sykes's middle name, warned that refusing to provide it could violate NRS 197.190.[23]  Once the warrant was confirmed, Shaffer handcuffed Sykes and transported him to the Henderson Detention Center.[24]  The Lexus that Sykes had driven to Morrell Park was then impounded for safekeeping and an inventory search was performed.  Love was released without charges after the robbery investigation developed further.[25]

**C.      Sykes sues the City and the officers over the stop, arrest, and impounding of his car.**

Sykes brings this action under § 1983 and Nevada law against Officers Watts and Shaffer, Sergeant Abernathy, and the City of Henderson.  After numerous screenings and a motion to dismiss, Sykes was left with claims for false arrest and unreasonable search and seizure, equal protection, conspiracy under 42 U.S.C. §§ 1985(3) and 1986, and negligent infliction of emotional distress against Officers Watts, Shaffer, and Abernathy.  What remains against the City of Henderson is Sykes's negligent-infliction-of-emotional-distress claim under respondeat superior.  Discovery is over.[26]

The defendants now move for summary judgment on all claims.  The officers argue that the stop was supported by reasonable suspicion, the arrest was justified by an active bench warrant and Sykes's refusal to provide identifying information, the Lexus was lawfully impounded and searched, and the rest of Sykes's theories fail for lack of evidence.  The City

---

[22] *Id.* at ¶¶ 27–29.

[23] *Id.* at ¶¶ 30–31.

[24] *Id.* at ¶ 33.

[25] ECF No. 50 at 6; ECF No. 50-4 at 5; ECF No. 50-7 at 4–5; ECF No. 50-5 at 8–9; ECF No. 50-6 at 5.

[26] ECF No. 49.

contends that it is entitled to summary judgment because Sykes's *Monell* theory did not survive screening and no viable state-law claim remains to support respondeat-superior liability.

Sykes opposes the motion. He emphasizes that he was a witness, not a suspect, and that the officers learned that soon enough, so any robbery-based justification for the stop should have fallen away. What followed, in his view, was an unlawful escalation: a detention that stretched beyond its original purpose and did not lawfully ripen into the warrant-based arrest the defendants now defend, and a search and tow of his Lexus that flowed from the same seizure. He also contends that the encounter was discriminatory, coordinated, and emotionally damaging. Sykes separately moves for leave to file a sur-reply, arguing that the defendants' reply brief raises new issues that he should be allowed to address.

## Discussion

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[27] If the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[28] But "mere speculation cannot raise an issue of fact."[29] The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[30]

---

[27] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[28] *Id.* at 323.

[29] *Emeldi v. Univ. of Or.*, 698 F.3d 715, 728 (9th Cir. 2012).

[30] *Celotex,* 477 U.S. at 322.

The court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[31]

**A.      Sykes's motion for leave to file a sur-reply is denied.**

Sykes moves for leave to file a sur-reply because he believes that the defendants' reply raises six new matters for the first time: that his opposition was untimely, that he abandoned certain claims, that his verified complaint is not competent Rule 56 evidence, that the video evidence defeats his version of events, that qualified immunity can be resolved without a jury, and that the stop lawfully expanded from a robbery investigation into a warrant investigation.[32] He contends that those points were not fairly raised in the summary-judgment motion, so he should be allowed to respond to them now.

Generally, sur-replies are "discouraged" under Local Rule 7-2(b) and "[b]road deference is given to a district court's interpretation of its local rules."[33] But if the reply raises new issues or presents new evidence, the court may grant the non-movant an opportunity to respond and address them.[34] Otherwise, the court may deny further briefing.[35]

Most of what Sykes identifies as "new" in the reply is not new at all, it is proper rebuttal. The defendants' reply responds to positions Sykes took in his opposition—his reliance on the

---

[31] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[32] ECF No. 59.

[33] *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007).

[34] *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[If] new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." (simplified)).

[35] *See Finley v. Fax*, 683 F. App'x 630, 631 (9th Cir. 2017) ("The district court did not abuse its discretion in denying [the] request for leave to file a sur-reply because the district court reviewed the briefing and found no new issues raised in defendants' reply that necessitated further argument.").

verified complaint, his view of the bodycam footage, his invocation of HPD policy, his theory that the stop was unlawfully prolonged, and his insistence that the remaining claims survive summary judgment. A reply is supposed to do that. And to the extent the defendants sharpened arguments about waiver, evidentiary sufficiency, or qualified immunity, those points arose directly from the way Sykes framed his opposition; they were not new issues. Nor does the proposed sur-reply persuade me otherwise. Much of it just reargues the Sykes's disputes with the summary-judgment motion, repeats points already made in his opposition, or attempts to expand the issues with new arguments of his own. So I deny Sykes's motion for leave to file a sur-reply.[36]

### B.      Whether qualified immunity shields the officer-defendants from Sykes's unlawful-arrest claim cannot be resolved on this record.

Sykes's Fourth Amendment claims against Officers Watts, Shaffer, and Abernathy are for false arrest and unreasonable search and seizure of his car. The officers move for summary judgment on both claims and invoke qualified immunity. They argue that no constitutional violation occurred at any point: the stop was supported by reasonable suspicion, the arrest was supported by a facially valid bench warrant and probable cause to believe Sykes violated NRS 197.190, and his car was lawfully impounded and inventoried under community-caretaking principles and HPD policy. And even if Sykes could show some constitutional defect, he has not identified clearly established law, in the specific circumstances presented here and as to each officer individually, that would have put every reasonable officer on notice that the challenged conduct was unlawful.

---

[36] Even if I were to consider the contents of Sykes's sur-reply in resolving the defendants' motion, my ruling would not change in any way.

Qualified immunity shields government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[37]  When a defendant raises this affirmative defense, the plaintiff bears the burden of demonstrating that both prongs are met. The evidence must be considered in the light most favorable to the plaintiff.[38]  The plaintiff's failure to establish either prong compels summary judgment in favor of the defendant on qualified-immunity grounds.  Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[39]

For a right to be clearly established under the second prong, it must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right."[40]  The "rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."[41]  And the right may not be characterized "at a high level of generality."[42]  Instead, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established."[43]  The takeaway from the Supreme Court's recent qualified-immunity jurisprudence is that a court's analysis of the clearly-established-law prong

---

[37] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[38] *Isayeva v. Sacramento Sheriff's Dep't.*, 872 F.3d 938, 946 (9th Cir. 2017); *Tolan v. Cotton,* 572 U.S. 650, 657 (2014).

[39] *Isayeva*, 872 F.3d at 946 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[40] *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)).

[41] *Id.*

[42] *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742).

[43] *Id.*

"must be undertaken in light of the specific context of the case, not as a broad general proposition."[44]  A clear understanding of what factually happened is thus critical to this analysis.

The officer-defendants' qualified-immunity theory on Sykes's false-arrest claim treats the encounter as constitutionally seamless.  They contend that they lawfully stopped Sykes while investigating a violent robbery, lawfully sought identifying information during that stop, discovered an active bench warrant for "Mark Clifford Sykes," and then arrested him on that warrant and for obstruction when he refused to provide his full name to confirm that they had the right guy for the bench warrant.  In their view, because the investigative stop was justified at the outset and the arrest was supported by a facially valid warrant and probable cause to believe Sykes violated NRS 197.190, no Fourth Amendment violation occurred at any point.[45]

Sykes's version is different in two ways that matter.  First, he contends that officers had no valid basis to treat him as a robbery suspect because the suspect descriptions offered did not match him or Love.[46]  Second, even assuming officers could initially stop him, he argues that the detention later outlived whatever robbery-based justification supported it and that the arrest did not lawfully ripen from a *Terry* stop into a warrant-based arrest in the clean way the officers describe.[47]

A seizure of a person for an investigatory stop is reasonable if, under all of the circumstances known to the officers at the time, (1) the officers had a reasonable suspicion that the person seized was engaged in criminal activity and (2) the length and scope of the seizure

---

[44] *Id.*

[45] ECF No. 50 at 10–16.

[46] *See* ECF No. 56 at 8.

[47] *See id.* at 14.

10

was reasonable.[48]  I find that the record establishes without reasonable dispute that the officers had reasonable suspicion to conduct an investigatory stop of Sykes.  But genuine disputes about the sequence of events and what factually occurred preclude this court from determining whether the length and scope of Sykes's detention was reasonable such that the officer defendants are entitled to qualified immunity from Sykes's Fourth Amendment claim for false arrest.

        **1.**      ***The officers had reasonable suspicion to conduct an investigative stop.***

"Reasonable suspicion" is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[49]  The reasonable-suspicion standard "is not a particularly high threshold to reach."[50]  An officer is permitted to draw on his own "experience and specialized training to make inferences from and deductions about the cumulative information available to the officer that might otherwise elude an untrained person."[51]

The officers argue that this standard was met here.  Their evidence shows that officers were responding to a violent robbery and carjacking at Morrell Park, and dispatch relayed that light-colored cars in the south parking lot might be involved.[52]  When Watts and Shaffer arrived, they found two silver cars backed into spaces, indications on the ground they understood to suggest a recent struggle, and two men behind those vehicles who appeared to be trying to stay

---

[48] *Terry*, 392 U.S. at 21-22; *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); Ninth Circuit Model Civil Jury Instruction 9.21.

[49] *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).

[50] *United States v. Bontemps*, 977 F.3d 909, 915 (9th Cir. 2020).

[51] *Hart v. Parks*, 450 F.3d 1059, 1067 (9th Cir. 2006); *see also United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999).

[52] ECF Nos. 50-1–2.

11

out of view.[53]  On those facts, the officers contend that they had reasonable suspicion that Sykes and Love may have been involved in the reported robbery.

Sykes resists that conclusion by pointing to facts that, in hindsight, make him look much more like a witness than a perpetrator.  He emphasizes that the stolen car was a gray Honda Civic, not a Lexus or BMW, that the victim's later-translated account described a white woman and a white or Hispanic man, and that at least one park witness ultimately described Sykes and Love as witnesses rather than perpetrators.[54]  But that argument relies too heavily on information that the officers had not fully sorted out before they first made contact.

What the record does show is narrower, but still enough.  While the victim's 911 call was still unfolding, dispatch logged a contemporaneous witness report of a man dragged by a vehicle after a fight, with the vehicle still on scene backed into parking spots and two Black male adults nearby.  The same materials also reflect that two light-colored vehicles were potentially involved.[55]  The officers do not clearly show that every one of those details reached them in that exact form before they approached Sykes and Love, but they do consistently aver that they were told two silver cars backed into parking spaces were tied to the incident.  And when the officers arrived, they found two silver cars in that exact position, signs on the ground they understood to suggest a recent struggle, and two men behind those vehicles.

Sykes is right that the facts look different in hindsight than they did in the moment.  The victim was Spanish-speaking, difficult to understand, and initially hard to locate.[56]  And the record supports the view that both Jamie and the park witness were ultimately describing Sykes

[53] ECF No. 50-3 at 4, ¶¶ 20–23; ECF No. 50-4 at 3, ¶¶ 13–16.

[54] ECF No. 6 at 8; ECF No. 56 at 9; ECF No. 56 at E-3.1 (filed manually by Sykes).

[55] ECF Nos. 50-1, 50-2.

[56] *See* ECF No. 50-1 at 2; ECF No. 50-2 at 3–5.

12

and Love as witnesses who saw the robbery unfold, not as the people who committed it.[57]  But that is not how the information was initially relayed to the officers who made the stop.  The witness's later correction—that Sykes and Love were witnesses, not participants—came only after the stop had already occurred.[58]  So the problem was not that the officers ignored information clearly identifying Sykes and Love as witnesses at the outset; it is that the information as conveyed initially suggested their involvement.  The officers have thus established that the initial seizure of Sykes for an investigative stop was based on reasonable suspicion that he was engaged in criminal activity.

### 2.   *But the officers have not shown no genuine dispute that the stop remained reasonable until it ripened into a warrant-based arrest.*

Of course, a stop justified at the outset may still become unreasonable if its length or scope exceeds what the circumstances permit.[59]  The officers argue that because the stop began with reasonable suspicion, *Terry v. Ohio* allowed them to investigate further; the U.S. Supreme Court's opinion in *Hiibel v. Sixth District Court of Nevada*[60] permitted them to insist on getting Sykes's middle name during that stop; and a Tenth Circuit case[61] let them to use that information to run a warrant check.[62]  Once the records check revealed an active bench warrant for Mark Clifford Sykes, the arrest was constitutional both because it was supported by a facially valid

---

[57] ECF Nos. 56 at E-7, E-3.1.

[58] ECF No. 56 at E-7, 20:35 PST; ECF No. 56, E-3.1 at 21:43 PST.

[59] *Terry*, 392 U.S at 18–19.

[60] *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177 (2004) (holding that an obstruction arrest for failure to identify under NRS 171.123(3) did not offend the Fourth or Fifth Amendments under the assumption that the statute required a suspect to give just his name).

[61] *United States v. Villagrana-Flores*, 467 F.3d 1269 (10th Cir. 2006).

[62] ECF No. 50 at 11–12; ECF No. 50-10 (bench warrant).

13

warrant and because Sykes's refusal to provide his middle name gave them an additional basis to arrest him for violating NRS 197.190. In their telling, then, the encounter unfolded as one continuous lawful progression: valid *Terry* stop→lawful identity inquiry→lawful warrant check→lawful arrest.

If the record conclusively established that sequence, the officer defendants' position would be strong. A facially valid bench warrant can supply probable cause to arrest,[63] and if officers actually reached that point while the stop was still lawfully in progress, then the arrest itself would rest on firmer constitutional footing than a mere *Terry* stop. But the officers do not establish when that warrant-based justification actually arose in relation to the stop that came first. That omission matters because Sykes's theory is not simply that the officers were mistaken about him; it is that even if the stop began lawfully, it quickly outlived its robbery-investigation purpose. He argues that once officers were told that he was a witness rather than a suspect, investigating warrants and his driver's license did nothing to determine whether he had committed the robbery. In Sykes's view, the encounter was prolonged beyond its original mission without any new lawful basis.

The officers do not really answer that argument. In their reply, they say that Sykes did not plead a separate claim for delay, that seeking identification and checking for warrants did not exceed the stop's scope, and that any delay was caused by Sykes's gamesmanship.[64] But that response sidesteps the pertinent issue of whether the officers have carried their Rule 56 burden on the theory they advance. Because they defend this encounter as one continuous, lawful progression from stop to warrant-based arrest, they must show that the record establishes that

---

[63] *Case v. Kitsap Cnty. Sheriffs Dep't*, 249 F.3d 921, 927–28 (9th Cir. 2001).

[64] ECF No. 57 at 11.

14

progression without a genuine factual dispute. While Sykes marshals facts suggesting that the officers were being told he was a witness rather than a suspect, the officers do not meaningfully address the question that matters most: what information was actually known to the officers at each stage of the stop, why that information did not dispel suspicion when it was received, or whether suspicion had already dissolved before the officers shifted into the warrant search they now invoke.[65]

The chronology the parties identify makes this deficiency consequential. The dispatch history reflects that, at about 20:26, officers were responding to the reported carjacking of a gray Honda Civic.[66] By about 20:27, the information included that the second suspect was a white woman.[67] Four minutes later, officers were confronting Sykes and Love in the south parking lot.[68] And a few minutes after that, the audit trail reflected that the driver-suspect was a white man.[69] The record also contains contemporaneous information suggesting that Sykes and Love were witnesses, not perpetrators. Non-defendant Officer Navarro reported that after speaking with a group under the park canopy, a witness pointed out the two silver sedans and said that

---

[65] The defendants' handling of the video evidence does not help resolve this dispute. In their reply, counsel claims to have supplied timestamps of when officers interacted with Sykes "to assist the Court," but they never explain which timestamps establish which steps in their theory, nor do they walk through the critical transition points. ECF No. 57 at 16. And the defendants' broad citation to the bodycam footage does not satisfy that burden. If the theory is that the videos conclusively establish a particular sequence of events, then the motion must explain which footage shows what, and why. Courts are not obliged to mine the record for arguments the defendants chose not to develop. As the Seventh Circuit has famously stated, "[j]udges are not like pigs, hunting for truffles buried in the briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[66] ECF No. 50-2 at 2.

[67] *Id.* at 3.

[68] *See id.* at 50-9 (Shaffer's bodycam footage).

[69] *Id.* at 6.

15

"the males by those two cars knew what happened because the event occurred where their cars were parked," and this information was relayed to officers over the radio.[70] So at least one strand of information was transmitted to officers that described Sykes and Love as men who witnessed the robbery rather than committed it.

The officer-defendants' declarations and the chronology in the bodycam footage also do not match. In their declarations, the officers describe an orderly sequence: officers learned of the warrant, sought Sykes's middle name to confirm it (asserting that it was "clear" Sykes "was told that he was being arrested for the bench warrant), warned that refusal could support an obstruction charge, and only then arrested him on the warrant and obstruction.[71] Their reply briefing presses the same point, asserting that it was "clear" Sykes "was told that he was being arrested for the bench warrant, and that if he continued to refuse to provide his middle name, that he would [be] charged with obstruction."[72]

But the footage could permit a jury to see the sequence differently. In Shaffer's bodycam recording, officers are still arguing with Sykes about whether he had a driver's license and drove the Lexus when Abernathy told him to turn around and Shaffer handcuffed him.[73] It was while that arrest was already underway that Abernathy asked for Sykes's middle name.[74] When Sykes did not answer, Abernathy explained that refusal would result in an "additional charge" of

---

[70] ECF No. 6 at 46.

[71] *See* ECF Nos. 50-3, 50-4, 50-7.

[72] ECF No. 57 at 9.

[73] ECF No. 50-8 (Shaffer bodycam footage) at 20:54:15–20:56:49.

[74] *Id.*

obstruction.[75]  Because the timing of that transition is genuinely disputed, I can't determine the reasonableness of the officers' arrest conduct.

That same dispute also prevents me from resolving qualified immunity on this record.  It is true that Sykes bears the burden to show that the law was clearly established once qualified immunity is raised.  But the defendants still seek summary judgment, and their qualified-immunity argument never settles the factual dispute that controls the analysis here.  They recite the familiar rule that clearly established law must be defined with specificity and then assert, at a high level of generality, that Sykes has not met his burden.[76]  What they do not do is show that there is no genuine dispute about the sequence of events on which their qualified-immunity theory depends.  And because their motion never meaningfully addresses that timing question such that I can determine what happened here without genuine dispute, I cannot determine on summary judgment whether every reasonable officer in their position would have understood the continued detention to be lawful.  So the officers' entitlement to qualified immunity from Sykes's unlawful-arrest claim cannot be resolved at this stage.

**C.      The officers are entitled to summary judgment on Sykes's claim that his car was unlawfully impounded and inventoried.**

Sykes claims that after he was handcuffed and removed from the scene, officers searched, impounded, and towed his Lexus without consent, probable cause, or a valid warrant in violation of the Fourth Amendment's guarantees against unreasonable search and seizure.  The officers

---

[75] *Id.*

[76] ECF No. 50 at 27–28; ECF No. 57 at 12–13.

17

contend that the Lexus was lawfully impounded for safekeeping under the community-caretaking doctrine and then lawfully inventoried under standardized department procedures.[77]

The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment,[78] so it must be reasonable. As part of their "community caretaking" function, police officers may impound vehicles that "jeopardize safety and the efficient movement of vehicular traffic."[79] Whether an impoundment is warranted under the community-caretaking doctrine "depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft."[80] And if allowing a driver to remove a vehicle would result in a violation of a traffic regulation, impoundment of a vehicle is reasonable.[81]

The officers point out that Sykes's Lexus was parked two spaces from where the victim's Honda had just been stolen and where the victim was injured trying to stop the theft.[82] They also note that the car was in Morrell Park, which closed at midnight, so overnight parking was prohibited and the car soon would have been illegally parked and subject to tow anyway. They add that the impound record[83] and HPD policy DP510, in their view, show that the inventory search was administrative rather than investigative and was performed by nonparty officers following standardized procedures.[84]

---

[77] ECF No. 50 at 16–17.

[78] *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).

[79] *Id.* at 864 (internal quotation marks omitted).

[80] *Id.* (citing *United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005)).

[81] *See Miranda*, 429 F.3d at 865.

[82] ECF No. 50 at 17.

[83] ECF No. 50-14.

[84] ECF No. 50 at 18.

18

Sykes counters that the tow flowed from an unlawful arrest and was therefore unconstitutional for that reason alone.[85]  He also maintains that officers knew by then that he was not involved in the robbery and that the search and tow of his car thus lacked any lawful basis. But the defense record reflects a separate reason the Lexus could not simply be handed back to Sykes at the scene.[86]  Abernathy attests that Sykes resisted saying he had "driven" a vehicle to Morrell Park, described himself instead as a "traveler," and said he had "travel papers" rather than a valid driver's license.[87]  So while Sykes may dispute the stop-and-arrest sequence, he does not raise a triable issue that officers lacked a lawful basis to impound the car.

Nor does Sykes identify evidence creating a triable dispute on the inventory search itself. The impound record shows that the inventory search was performed by nonparty officers J. Hijar and E. Tschirgi, not by Defendants Watts, Shaffer, or Abernathy.  And the officers support the search with the applicable HPD impound-and-inventory policy.  Sykes offers no evidence that the inventory search was a pretext for a general evidentiary rummaging rather than an administrative step following a lawful impound.  I therefore grant summary judgment for the officers on the portion of Sykes's Fourth Amendment claim based on the impounding and inventory search of his vehicle.

**D.     The officers are entitled to summary-judgment on Sykes's equal-protection claim.**

In his Fourteenth Amendment equal-protection claim under 42 U.S.C. § 1983, Sykes claims that he was racially profiled because there were multiple people at the park at the time of

---

[85] ECF No. 56 at 7–8.

[86] *See* ECF No. 51-9 (Abernathy's bodycam footage) at 20:54.

[87] ECF No. 50-7 at ¶¶ 42–45.

the incident, yet only the black males were treated as suspects despite their racial dissimilarity from the robbery suspects.[88]  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."[89]  To prevail on a claim for racial profiling in violation of the Equal Protection Clause, a plaintiff must demonstrate that "the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class."[90]  "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status."[91]

The officers move for summary judgment on this claim, arguing that Sykes and Love were not similarly situated to the other people in the park.[92]  Officers did not single out the only Black men they saw, they contend; they detained the two men near two light-colored vehicles that dispatch just informed them of.  The defendants also argue that Sykes has no evidence that any officer made racially charged remarks, relied on race alone, or otherwise acted with discriminatory purpose.

Sykes responds that the officers' stated justification was a pretext for treating Black men as suspects and everyone else as witnesses.  He points out that the victim's account described a white woman and a white or Hispanic man, not two Black men.  He argues that other people in the park—including white individuals—were questioned as witnesses (despite one of them

---

[88] ECF No. 23 at 5.

[89] *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (cleaned up).

[90] *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005).

[91] *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (quoting *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994)).

[92] ECF No. 50 at 19–22.

drinking out of an open container[93]) while he and Love were approached with lights, commands, and drawn weapons.[94]

Sykes's evidence is insufficient to carry this claim past summary judgment.  To be sure, race played into this investigation.  But what is necessary for Sykes's equal-protection claim is evidence that these officers treated Sykes as a suspect because he was Black, not because of what they encountered at the scene that, in their view, matched the information coming from dispatch.  This record does not permit that inference without pure speculation.  So the defendants are entitled to summary judgment on Sykes's equal-protection claim.

**E.    The officers are entitled to summary judgment on Sykes's conspiracy claims.**

Sykes also brings conspiracy claims under 42 U.S.C. §§ 1985(3) and 1986.  He alleges that the officers acted in concert to deprive him of his rights because he is Black, and that those with the power to stop the conspiracy failed to do so.  Title 42, Section 1985(3) provides a cause of action for a conspiracy to deny anyone of his civil rights and requires a showing of some racial or class-based discrimination.[95]  "To bring a cause of action successfully under § 1985(3), a plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."[96]  A claim under this statute must

---

[93] ECF No. 56 at E-7, 20:39:22.

[94] *Id.* at 13.

[95] *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000).

[96] *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992).

accompany a deprivation of rights under § 1983.[97]  Section 1986 creates a cause of action against anyone who fails to prevent a conspiracy to discriminate based on race[98]; such a claim can survive only if it accompanies a valid claim under section 1985.[99]  "A mere allegation of conspiracy without factual specificity is insufficient."[100]

The officers move for summary judgment on Sykes's conspiracy claims, arguing that they fail because Sykes has no evidence of the required conspiratorial agreement or racial animus.[101]  Sykes's response on this point is thin.  He does not develop a separate summary-judgment argument on the elements of §§ 1985(3) and 1986. Instead, he says that his "position and arguments have not changed since this court's prior ruling," and he incorporates by reference my discussion of his conspiracy claims in the order denying the motion to dismiss them.[102]  He adds only the conclusory arguments that "[a]ll officers failed to intervene despite observing clearly unlawful and discriminatory conduct" and "[t]heir unified conduct supports an inference of conspiratorial action and deliberate indifference."[103]

---

[97] *Caldeira v. Cnty. of Kauai*, 866 F.2d 1175, 1177 (9th Cir. 1989), *cert. denied*, 493 U.S. 817 (1989) (noting that it's well-established that there can be no § 1985 claim in the absence of a § 1983 claim); *see also Thornton*, 425 F.3d at 1168 ("The absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on the same allegations.") (citation omitted).

[98] *Karim-Panahi*, 839 F.2d at 626.

[99] *Id.*

[100] *Id.*

[101] ECF No. 50 at 22–23.  The conspiracy discussion in the officers' briefing is more skeletal than analytic.  The motion sets out the black-letter standards, and the reply characterizes Sykes's showing as speculative, but the defendants do little to connect those propositions to the factual record.

[102] ECF No. 56 at 9.

[103] *Id.*

That may have been enough at the pleading stage, but it is not enough now. When I denied the motion to dismiss these claims, I held that Sykes had plausibly alleged a conspiracy because he alleged that the officers huddled before approaching him and "concocted a story about a second 911 call," yet dispatch later told him there had been only one 911 call.[104] Given those allegations, and because Sykes's racial-profiling claim had also survived dismissal, I concluded that he had plausibly alleged both a § 1985(3) conspiracy and a derivative § 1986 claim.

But the evidentiary record does not prove the allegations on which these claims are based. Sykes's verified complaint is still evidence to the extent it is based on his personal knowledge, so it establishes that dispatch told him there had been only one 911 call. But there is no evidence in this record to show that officers concocted a false story about a second call. And the audit-recall materials the officers produced reflect that there was, in fact, a separate contemporaneous report from a caller identified as "Jamie."[105]

The conspiracy claim also fails for the additional reason the equal-protection claim fails: no proof of discriminatory purpose. Sykes has evidence that the officers jointly handled the stop, but he does not have evidence that they agreed to target him because he is Black. Nor does he identify any communication, act, or circumstance from which a jury could infer that the officers' coordination was motivated by racial animus rather than by their shared, if disputed, misunderstanding of the robbery investigation. His assertion that their "unified conduct" supports conspiracy is too conclusory to bridge that gap at summary judgment. And because § 1986 imposes liability only if there is a viable underlying § 1985 conspiracy, and Sykes has not

---

[104] ECF No. 32 at 12.

[105] ECF No. 50-1.

23

raised a triable issue on § 1985(3), the derivative § 1986 claim cannot survive.  So the officers are entitled to summary judgment on both conspiracy claims.

**F.      The officers are entitled to summary judgment on Sykes's NIED claim.**

Sykes also brings a Nevada NIED claim against the officers, theorizing that they negligently detained and kept him in custody for one day without a confirmed warrant, while falsely treating him as obstructive even though he says they knew he was only a witness and not one of the suspects.[106]  Those actions, he contends, caused him significant emotional and physical harm, including severe anxiety, fright, shock, fear, and emotional distress.

The officers move for summary judgment on that claim.  They argue that, under the Nevada Court of Appeals' decision in *Doe v. Roman Catholic Bishop of Las Vegas and His Successors*,[107] a direct-victim NIED theory is not a standalone tort at all, but only a category of damages that may be recovered through a negligence claim.[108]  And because Sykes has not established a viable negligence claim of that sort, his NIED claim fails as a matter of law.

Sykes responds to this argument, though not in a way that ultimately saves the claim.  He incorporates my order denying the motion to dismiss this claim; argues that his unlawful detention, arrest, and public mistreatment caused him mental anguish; and contends that the officers' conduct—including drawing and pointing firearms at him in public—was especially traumatic because, as a Black man, he experienced that show of force in the shadow of widely publicized police killings of Black men.[109]

---

[106] ECF No. 6 at 24–25.

[107] *Doe v. Roman Catholic Bishop of Las Vegas and His Successors*, 526 P. 3d 109 (Table), 2023 WL 2657324 (Nev. App. 2023) (interpreting *Shoen v. Amerco*, Inc., 896 P.2d 469, 477 (Nev. 1995)).

[108] ECF No. 50 at 24.

[109] ECF No. 56 at 10.

Even if I accept for purposes of this argument that Nevada law permits Sykes to pursue an NIED claim as a standalone claim, he has not identified evidence to get that theory to a jury because his showing is conclusory as to his distress. Nevada law requires "objectively verifiable indicia" of the severity of emotional distress.[110] General physical or emotional discomfort is insufficient to demonstrate severe emotional distress.[111] And NIED requires "either a physical impact must have occurred or, in the absence of physical impact, proof of serious emotional distress causing physical injury or illness. . . ."[112]

In his verified complaint, Sykes avers that he suffered "severe emotional distress," "severe anxiety," and "extreme and severe fright, shock, fear, horror, and emotional distress."[113] Those descriptions are conclusory and are not objectively verifiable indicia of serious emotional distress.[114] So the defendants are entitled to summary judgment on this claim, too.

**G.     The City of Henderson is entitled to summary judgment on Sykes's claims against it.**

The City of Henderson first moves for summary judgment on Sykes's claims against it arguing that Sykes's *Monell* theory is no longer a part of this case. The City is correct. Sykes's only claim against the City is for NIED.

---

[110] *Dep't of Transp. v. Hill*, 963 P.2d 480, 483 (Nev. 1998), *overruled on other grounds by Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999) (noting requirement for physical manifestations of emotional distress in NIED claims).

[111] *Burns v. Meyer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001) (citing *Chowdhry v. NLVH Inc.*, 851 P.2d 459, 462 (Nev. 1993)).

[112] *Olivero v. Lowe*, 995 P.2 1023, 1025 (Nev. 2000) (quoting *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386–87 (Nev. 1998)).

[113] ECF No. 6 at 25.

[114] *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998) (finding that plaintiff's own testimony that he was depressed for some time did not create a triable issue on severe emotional distress when he sought no medical or psychiatric care and presented no objectively verifiable indicia of severity).

25

In his amended complaint, Sykes tried to hold the "City of Henderson (A.K.A.) Henderson Police Department" (HPD) municipally liable for the officers' alleged constitutional violations. In my amended screening order, I dismissed that *Monell* claim and allowed only his NIED claim to proceed against HPD.[115] My later order on the motion to dismiss did not revisit that municipal-liability ruling on the merits. It addressed a different issue: the defendants' argument that HPD is not an entity capable of being sued.[116] So I construed Sykes's pleading as one against the City of Henderson instead of HPD.[117] The fact that the concluding paragraph of that order listed the City alongside the individual officers on the remaining claims created some confusion. But that substitution of the proper municipal defendant did not the *Monell* theory that had already been dismissed at screening. So to the extent that there is any tension between the two orders, I clarify now that the *Monell* theory remains dismissed.

That leaves Sykes's NIED claim against the City under a respondeat-superior theory as his only cause of action against the municipality. But because that claim fails on its merits against the individual defendants, there is no predicate tort on which to hold the City vicariously liable. So the City, too, is entitled to summary judgment on the NIED claim.

### Conclusion

IT IS THEREFORE ORDERED that defendants' motion for summary judgment **[ECF No. 50] is GRANTED in part**. The defendants are entitled to summary judgment on all claims except for Sykes's false-arrest claim against Officers Shaffer, Watts, and Abernathy because disputes of material fact preclude a finding of qualified immunity at this time.

---

[115] ECF No. 14 at 12.

[116] ECF No. 32.

[117] *Id.* at 14.

The Clerk of Court is directed to **TERMINATE the City of Henderson as a defendant.**

IT IS FURTHER ORDERED that Sykes's motion for leave to file a sur-reply **[ECF No. 59] is DENIED.**

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a mandatory settlement conference**.  **The parties' obligation to file a joint pretrial order is STAYED** until 30 days after that settlement conference.

IT IS FURTHER ORDERED that **this case is referred to the Pro Bono Program** to seek an attorney to represent Sykes without charge.[118]  Sykes is advised that pro bono attorneys are scarce, and it is entirely possible that no attorney will ultimately be bound to represent him. Therefore, Sykes must continue to represent himself unless and until an attorney has accepted his representation.  Sykes must promptly complete and return any forms provided by the program to participate in it.

_____
U.S. District Judge Jennifer A. Dorsey
March 31, 2026

---

[118] This does not preclude a pro bono attorney from seeking an award of fees and costs from any award in this case, or from seeking reimbursement of costs through program resources.